UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
Richard Hatch,                                    )
              Petitioner,                       )
                                                  )
v.                                                )
                                                  )          CA Number _____
                                                  )
Harley G. Lappin, Director of Bureau              )
of Prisons, and James M. Cummings,                )
Sheriff of Barnstable County,                     )
                                                  )
              Respondents.                     )
_____

**Memorandum of Law In Support of Petition for Habeas Corpus and
Motion for Expedited Hearing**

_____

**Preliminary Statement**

Petitioner Richard Hatch is a federal prisoner currently being held by the United States Bureau of Prisons ("BOP") at the Barnstable County Correctional Facility ("BCCF"). In May 2009, while serving the last portion of a sentence for tax-related offenses, Petitioner was approved for release under home confinement. On August 18, 2009, he was abruptly removed from his home and placed in solitary confinement at BCCF after he participated in television interviews and a radio talk show, in the course of which he was critical about the government's prosecution of his case. No rule of the Bureau of Prisons or the Barnstable Sheriff's office limits the ability of persons under home confinement to speak with members of the press or requires them to obtain prior permission before doing so. Respondents' imprisonment of Petitioner is not authorized

1

by law and violates basic protections enshrined in the First Amendment.

## Statement of Facts

In 2000, Petitioner became the winner of the first season of the television show "Survivor" and the focus of continuing media attention in the years since then. In January 2006, Petitioner was convicted in the United States District Court for the District of Rhode Island of two counts of attempting to commit tax evasion, and one count of filing a false tax return, and was sentenced to 51 months' imprisonment followed by 3 years' supervised release. See *United States v. Hatch*, No. 05-CR-00098-S-LDA.

Petitioner was imprisoned at BOP facilities until May 12, 2009, when, with less than six months to serve, he was approved by BOP for pre-release under home confinement to serve the last five months of his sentence at his home in Rhode Island under the supervision of Respondent Cummings.

Upon being placed in the program, Hatch was given a set of rules entitled "Barnstable County Sheriff's Office Electronic Incarceration Program Federal Inmate Handbook." Pet. Ex. A. The handbook explained 16 rules for the program and the disciplinary actions that would result if they were violated. Not one of the 16 rules – which are the only rules Respondents gave Petitioner— mentions contacting the media.

Although no rule of the BOP or the Barnstable County Sheriff placed any restrictions on contacts with or statements to news media by individuals in home comfinement, , Hatch's attorney, Cynthia R. Ribas, contacted BOP in July 2009 to obtain approval for Hatch to participate in a media interview while in home confinement. Though Ribas did not believe that such authorization was required, she sought approval as a matter of courtesy "in deference and good faith." Declaration of Cynthia M. Ribas

2

¶3 (Pet. Ex. B)[1] Ribas spoke with Carla Wilson, BOP's Public Media Executive, about the request. Wilson informed Ribas that "now that Petitioner was in home confinement, the BOP would approve a media interview." *Id.* at ¶4.

Petitioner accepted an interview request by NBC, and Ribas communicated this fact to Wilson. At Wilson's request, Ribas had NBC sign and fax to Wilson a BOP Media Representative Agreement. *Id.* at ¶5. Petitioner was neither asked to sign nor signed a comparable agreement. On August 17, 2009, Petitioner participated in a continuous sequence of three interviews with three units of NBC: the Today Show, Access Hollywood, and NBC's local Providence, Rhode Island affiliate. All of the interviews were conducted by the same NBC technical crew, using the same equipment, in the same location in Hatch's house, although each interview was conducted by a different interviewer for the different NBC shows.

During the interviews, Petitioner asserted his belief that he had been wrongly convicted and that the government had engaged in prosecutorial misconduct and had brought the case, at least in part, because of his sexual orientation. Petitioner also criticized the BOP for transferring him to a prison far from his home and family and suggested that this transfer may have been motivated by discrimination based on his notoriety and sexual orientation.

On August 17, 2009, shortly after the Today Show interview aired, Robert Corrente, who had served as U.S. Attorney for the District of Rhode Island at the time of Petitioner's prosecution, called into a local radio station in Providence and asserted that

---

[1] During the time that Hatch was an inmate and subject to BOP rules governing media contacts, Attorney Ribas had sought on several occasions to obtain BOP approval for Hatch to be interviewed. On each occasion, the request had been denied without explanation.

3

Petitioner was "delusional" and that the allegations made during the Today Show interview were "ludicrous." *Id.* at ¶11.

Petitioner respondend to Corrente's on-air statements by calling the radio show to dispute them. Petitioner had no reason to believe that he was in any way limited in making such a call as no rules governing home confinement required him to obtain prior approval for calling in to a radio show. Indeed, even while incarcerated, Petitioner had been told he could call in to radio shows without any prior approval.

The BOP moved swiftly to sanction Petitioner for his statements to the news media. On August 18, 2009, the day after the call to the radio station, the BOP ordered that Petitioner be removed from home confinement, and Respondent Cummings, accompanied by his principal deputy and several other armed officers of the Barnstable County Sheriff's Department, personally went to Petitioner's home and took him into custody. He was taken to the Barnstable County Correctional Facility and placed in solitary confinement in the administrative segregation unit, where he is now being held and seems likely to remain for the balance of his sentence.

In two different disciplinary reports, Respondents sought to justify Petitioner's removal from home confinement and placement in solitary confinement. The first of these, filed on August 18th, cited Petitioner for two "unauthorized" NBC interviews in addition to the Today Show interview. BOP took the position that it had only given Petitioner permission to be interviewed by the Today Show and that Petitioner had "violated policy by participating in unauthorized interviews" with interviewers from two additional affiliates of NBC.

On August 19th, BOP filed a second disciplinary report charging Petitioner with

4

unauthorized media contact based on his having called the radio station to respond to criticism levied against him by the former United States Attorney who had been responsible for prosecuting him. BOP claimed that the call amounted to "conduct[ing] an interview . . . without obtaining permission from anyone."

On August 27, 2009, after being held in solitary confinement for nine days, Petitioner was brought before a Barnstable County officer who went through the incident reports. Despite having requested it earlier, Petitioner was not given copies of evidence against him. During the meeting, Petitioner contended that his actions were not in violation of any written BOP policies or regulations; that if any such regulations existed, they were void for vagueness under the First Amendment and the Fifth Amendment Due Process Clause; and that his single stream of interviews with NBC did not constitute a material breach of the BOP-NBC agreement and BOP's implicit approval of the interview. The officer informed Petitioner that the proceeding, such as it was, was only a formality and that he was bound to follow BOP's orders and had no authority to reject BOP's charges. Hatch Affidavit ¶17 (Pet. Ex. D).

To date, BOP has not issued a formal ruling on the alleged incidents, and Petitioner remains in custody in solitary confinement at the Barnstable County Correctional Facility.

Petitioner has asked repeatedly for the BOP grievance form BP-10 or "Sensitive 10" in order to complain administratively about his detention. Barnstable Lieutenant Bonavita informed Hatch that the facility does not have that form and that it will be requested from BOP. To date, Hatch has not been provided with a form on which to file a grievance.

5

At the present time, Petitioner has less than a month remaining to serve. His term of incarceration ends on October 7, 2009.

**Argument**

**I.     Petitioner's Statements to the Media were Protected by the First Amendment**

The response of the government to Petitioner's broadcast statements was an exercise of official arrogance and an affront to the First Amendment. Respondents' decision to jail Petitioner for participating in interviews cannot satisfy even the standard applicable to individuals who remain in prison. In *Turner v. Safley*, 482 U.S. 78, 84 (1987), the Supreme Court held that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." Even inside the prison walls, restrictions on prisoners' First Amendment rights must be struck down unless the government can demonstrate that they are "reasonably related to legitimate penological interests." *Street v. Maloney*, No. 92-1822 1993 WL 125396, at *2 (1st Cir. Apr. 23, 1993) (quoting *Turner*, 482 U.S. at 89).

The Supreme Court has held that security needs *in a prison* may justify limitations on interviews with prisoners, but none of these reasons apply to Petitioner, who remained in his home during all of the interviews at issue. In *Pell v. Procunier*, (1974) and *Saxbe v. Washington Post Co.*, 417 U.S. 843 (1974), the Supreme Court upheld prison rules that prevented reporters from selecting prisoners to interview face-to-face on prison grounds. The Court identified two rationales for the restrictions. First, the "entry of outsiders into the prison for face-to-face contact with inmates" potentially gave rise to security risks. *Id.*, at 827. Second, some prisoners who

6

participated in interviews "became virtual 'public figures' within the prison society and gained a disproportionate degree of notoriety and influence among their fellow inmates," enabling them to become "the source of severe disciplinary problems." *Id.* at 831-32.

Reporters entering Petitioner's home for interviews and Petitioner's calling a radio station to express his views posed no threat whatsoever to prison security. Nor can Respondents argue that the interviews would make Petitioner a prison celebrity capable of inciting disorder – Petitioner, having been released from prison, was in no position to cause prison disturbances. Moreover, even Respondents presumably do not dispute that they authorized the *Today Show* interview or contend that it created a security risk. If the authorized *Today Show* interview was consistent with penological interests, surely the phone call to the radio station and the other interviews in Petitioner's home (which occurred on the same day as the authorized interview) were not inconsistent with penological interests.

Nor, indeed, was there any reason to regulate Petitioner's contacts with the media. Even in the context of parole, probation, and supervised release– areas analogous to home confinement conditions – courts have rejected a number of restrictions on conduct protected by the First Amendment as overly broad. In *United States v. Soltero*, the Ninth Circuit struck down a supervised release condition that prevented the defendant from associating with members of any "disruptive group," finding that "the term 'disruptive group' has a broad meaning and could reasonably be interpreted to include not only a criminal gang, but also a labor union on strike, a throng of political protesters, or a group of sports fans celebrating after their team's championship victory." 510 F.3d 858, 867 (9th Cir. 2007). *See also United States v. Crume*, 422 F.3d 728, 733 (8th Cir. 2005)

7

(striking down supervised release conditions barring access to computers and the Internet without prior permission and stating, "we are particularly reluctant to uphold sweeping restrictions on important constitutional rights"); *United States v. Sales*, 476 F.3d 732, 736 (9th Cir. 2007) (striking down condition requiring Respondent to "obtain approval from his probation officer before using any particular computer or computer-related device …"). Here, there is no suggestion that the restrictions sought to be imposed after the fact by BOP have any relation whatsoever to a legitimate penological interest.

More troubling still, is the fact that Petitioner was taken into custody for having levied criticism against the office of the U.S. Attorney and the Bureau of Prisons. The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Indeed, "[t]he sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office" – the very sort of speech that Mr. Hatch engaged in when he criticized federal prosecutors and the BOP. *Hustler Magazine v. Falwell*, 485 U.S. 46, 51 (1988).

Petitioner is entitled to maintain his innocence of the criminal charges that were brought against him. Since he was arrested and charged, he has sought to tell his side of the story to anyone who will listen. In our system, the resolution of public questions is left not to government fiat but to open public debate, for "when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better

8

reached by free trade in ideas – that the best test of truth is the power of the thought to get itself accepted in the competition of the market …" *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

In detaining Petitioner and returning him to jail, however, the government impermissibly punished Petitioner for his public criticisms, in violation of his fundamental freedom of speech.

## II.  No BOP or Barnstable County Rule Requires Persons in Home Confinement to Obtain Permission Before Contacting the Media

Once Petitioner was placed on home confinement, no written rule or policy of either BOP or BCCF required him to obtain permission to speak to the media. Instead, Respondents punished Hatch by revoking his home confinement and placing him in jail, citing a violation of a rule that applies only to incarcerated prisoners. In doing so, Respondents exercised unauthorized discretion to curtail Petitioner's liberty and freedom of speech.

Upon being placed on home confinement, Hatch was given a set of rules entitled "Barnstable County Sheriff's Office Electronic Incarceration Program Federal Inmate Handbook." Pet. Ex. A. The handbook explained 16 rules for the program and the disciplinary actions that would result if they were violated. Not one of the 16 rules – which are the only rules Respondents gave Petitioner—mentions contacting the media.

To justify re-incarcerating him, Respondents provided two incident reports alleging that Petitioner engaged in "Prohibited Act 327", described as "unauthorized contact with the public." Pet. Ex. C. The incident reports do not define "unauthorized

contact with the public," nor do they specify from what statute or regulation "Prohibited Act 327" is derived.

A review of publicly available BOP policies and regulations reveals that Prohibited Act number 327 exists only in two places: BOP Program Statement 5270.07 and 28 C.F.R. 541.13, both titled "Inmate Discipline and Special Housing Units." BOP's own explanation of the rules further confirms that the rules are meant to apply to inmates incarcerated at federal facilities, not persons on pre-release programs or in custody of local sheriffs. BOP Policy Statement 5270.07, itself, specifically excludes persons in Petitioner's situation from the rules.

> Examples of persons to whom this policy applies include, but are not limited to, an inmate who is on pretrial status, or on writ, or on escorted trip or furlough, or who is escorted by U. S. Marshals or other federal law enforcement officials, or who is in a camp, contract facility, (other than contract CCCs) or hospital, or who is returned to Bureau custody from a contract facility (includes contract CCCs). These provisions do not apply to a federal inmate designated to a non-federal facility (e.g., inmates serving Federal sentences in state facilities or contract CCCs).

The policy statement specifically excludes persons in "contract CCCs." BOP Policy elsewhere states that "contract CCCs" ("Community Corrections Centers") include halfway houses, special residences for pregnant inmates, and *home confinement*. BOP Policy 7310.04*, "Community Corrections Center (CCC) Utilization and Transfer Procedures,"* http://www.bop.gov/policy/progstat/7310_004.pdf. Barnstable County has a contract with BOP to provide CCC programs to federal prisoners. At the time when Petitioner spoke with the media, he was serving out his sentence in one of the "contract CCCs" specifically exempted from these rules.

A full, common-sense reading of the rules further clarifies why pre-release

programs are exempted.  The rules include prohibitions that simply cannot apply in the home confinement setting, such as: "Possessing unauthorized amount of otherwise authorized clothing" (Prohibited Act number 401); "Conducting a business" (Prohibited Act number 408); "Unauthorized physical contact (e.g., kissing, embracing)" (Prohibited Act number 409), and; "Smoking where prohibited" (Prohibited Act number 332).  *Id.*  It is clear that these rules were never meant to apply to situations of home confinement, and the Respondents have put forth no set of rules regulating media contacts for persons under home confinement.

Respondents aggravated their arbitrary punishment of Petitioner's protected speech activities by bypassing BOP's own regulations, which dictate that "[i]mposition of a sanction requires that the inmate first is found to have committed a prohibited act." 28 C.F.R. § 541.13(a).  The regulations and BOP policy call for an investigation of the allegations, an initial hearing, a subsequent hearing by a Unit Discipline Committee or Discipline Hearing Officer, and a right of appeal.  28 C.F.R. § 541.14 et seq.; BOP Policy Statement 5270.07, *Inmate Discipline and Special Housing Units*, http://www.bop.gov/policy/progstat/5270_007.pdf.  Instead, Petitioner was sanctioned summarily based on BOP's mere allegation that he had committed a prohibited act without any adjudication of wrongdoing.

The meeting that took place between Petitioner and a Barstable County officer lacks the safeguards and basic requirements of a "hearing."  The officer informed Petitioner that he had no authority to rule in any way that was contrary to BOP's allegations.  Petitioner had no opportunity to see the evidence against him or defend himself against the charges.  To date, Respondents have not informed Petitioner of an

adjudication of his case or of his right to appeal.

### III.  Petitioner's time-sensitive situation requires an emergency hearing

Petitioner has now spent 22 days in solitary confinement in Barnstable County Correctional Facility.  His sentence is due to expire on October 7, 2009, at which point the challenge to his detention may become moot.  Without an emergency hearing Petitioner risks losing the right to a remedy for his illegal detention, and Respondents will be permitted to inflict an egregious wrong without any penalty.

### Conclusion

For all of the above-stated reasons, this Court should issue a writ of habeas corpus, directing BOP immediately to release Petitioner from physical custody and return him to home confinement to serve out the remainder of his sentence.  Since BOP cannot lawfully keep Petitioner in custody beyond October 7, 2009, Petitioner further requests that this Court order an expedited hearing on this matter.

        Respectfully submitted,

        /s/Michael R. Schneider
        Michael R. Schneider
        BBO # 446475
        /s/Ryan M. Schiff
        Ryan M. Schiff
        BBO# 558852
        SALSBERG & SCHNEIDER
        95 Commercial Wharf
        Boston, MA 02110
        617-227-7788

/s/<u>John Reinstein</u>  
BBO # 416120  
/s/<u>Laura Rótolo</u>  
BBO# 665247  
American Civil Liberties  
Union Foundation of Mass.  
211 Congress Street  
Boston, MA 02110  
(617) 482-3170  


September 9,  2009

CERTIFICATE OF SERVICE

  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants September 9, 2009.


/s/Laura Rótolo

Sept. 9, 2009