UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD HATCH, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civ. Action No.   09-11490-NMG |
| ) | |
| HARLEY G. LAPPIN, Director of Bureau ) | |
| of Prisons, and JAMES M. CUMMINGS, ) | |
| Sheriff of Barnstable County ) | |
| ) | |
| Respondents. ) | |
| ) | |

**RESPONDENTS' SUPPLEMENTAL RESPONSE TO PETITIONER'S
PETITION FOR WRIT OF HABEAS CORPUS**

The Respondents, Harley G. Lappin and James M. Cummings ("Respondents"), file this supplemental response to Petitioner Richard Hatch's ("Petitioner") petition for writ of habeas corpus, as ordered at the hearing held on September 14, 2009.[1]  However, as the contours of Petitioner's claim are not clearly defined[2], the Respondents request that they be allowed to

---

[1] The Respondents continue to maintain that Petitioner has failed to exhaust his administrative remedies, he is not entitled to judicial relief, and dismissal of the petition is therefore appropriate. Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e provides that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Casanova v. Dubois, 289 F.3d 142 (1st Cir. 2002) (citing 42 U.S.C. § 1997e(a) and finding dismissal of case required unless exhaustion requirement was satisfied).  The doctrine of exhaustion is "well established", and "provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Woodford v. Ngo, 548 U.S. 81, 88-89 (2006) (case citations omitted).  "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007); see also Porter v. Nussle, 534 U.S. 516, 524 (2002) (finding mandatory exhaustion of administrative remedies).

[2] This response is filed on Respondents' behalf, in their official capacities, and in response to a petition for writ of habeas corpus.  Should the allegations be repled as an action

further supplement this pleading, if necessary for this Court's consideration.

The arguments and facts set forth in Respondents' initial reply [Doc. 7], as well as those made at oral argument, are incorporated as though fully set forth herein. In addition, this supplemental brief seeks to address the additional issues raised by the Court at the September 14, 2009 hearing.

I.   **The Prison Regulation Requiring A Prisoner To Obtain Permission In Advance Of Contact With The Media Does Not Violate The First Amendment**

Inmates in custody of the Bureau of Prisons retain First Amendment protections. Pell v. Procunier, 417 U.S. 817, 822 (1974). "Prisoners do not, however, enjoy the same level of constitutional protections as do other citizens." Shaheed-Muhammad v. DiPaolo, 393 F.Supp.2d 80, 97 (D. Mass. Sept. 26, 2005) (Gertner, J.). "Accordingly, prison regulations alleged to infringe constitutional rights are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." Id. (citing O'Lone v. Shabazz, 482 U.S. 342, 349 (1987)). "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Moses v. Dennehy, 523 F.Supp.2d 57, 60 (D. Mass. Nov. 19, 2007) (Young, J.) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)).

"[S]uch a standard is necessary if prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations." Turner, 482 U.S. at 89. The "judiciary is ill-equipped to administer and regulate the day-to-day activities of penal

---

brought under Bivens or pursuant to Section 1983, the issue is not properly before this Court (see footnote 1). Furthermore, the named individuals would require additional time to obtain approval of individual-capacity representation, as undersigned counsel is not authorized to represent the Respondents in their individual, personal capacities.

institutions...The management of such facilities requires expertise, knowledge, and skills that are the proper responsibility of other branches of government." Moses, 532 F.Supp.2d at 60 (citing Turner, 482 U.S at 84-85). "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton v. Bazzetta, 539 U.S. 126, 132 (2003); see also Beard v. Banks, 548 U.S. 521, 528 (2006) (substantial deference to the professional judgment of prison administrators); Beauchamp v. Murphy, 37 F.3d 700, 704 (1st Cir. 1994) (substantial latitude to state prison officials' judgment).

In determining the reasonableness of a prison restriction, this Court will look to the four-factor test articulated in Turner:

> [W]hether the regulation has a valid, rational connection to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are ready alternatives to the regulation.

Overton, 539 U.S. at 132. There is a legitimate penological interest in a rule requiring prisoners to obtain approval from the Bureau of Prisons ("BOP") in advance of a face-to-face interview with the media, and the Turner factors are satisfied in this case.

First and foremost, Petitioner was not denied access to the media, or a face-to-face interview. To the contrary, on August 12, 2009, the BOP approved Petitioner's request for an interview with the *Today* show to take place on August 17, 2009. Doc 1-4 at p. 3. On August 17, 2009, in addition to interviewing with the *Today* show, Petitioner also conducted unauthorized interviews with NBC Channel 10 (a local NBC affiliate in Rhode Island), and

3

Access Hollywood.  Id.  On August 19, 2009, the BOP learned that Petitioner also conducted a radio interview with WPRO News Talk Radio in Rhode Island without obtaining prior permission from the BOP.  Id. at p. 1.  As a result, disciplinary incident reports were written by the BOP.  Doc. 1-4.  Because of these disciplinary reports, Petitioner was returned from home confinement to BCCF, a higher level of custody.

Petitioner is a federal prisoner who was participating in home confinement.  "The objective of this [home confinement] program is to provide extended confinement services for federal offenders."  Exhibit A (Barnstable County Statement of Work) at p. 13.  "A home confinement program allows a prisoner to be temporarily released from his place of imprisonment to work in the community while continuing on official detention status."  Id.  "Offenders in this program reside in their homes, but remain in the custody of the Bureau of Prisons."  Id.  Electronic monitoring equipment ensures "that an extended confinement program participant remains in the specified location during the required hours."  Id.

The Barnstable County Sheriff's Office Electronic Monitoring Program ("EM") utilizes a GPS based ankle bracelet that tracks offenders twenty-fours hours a day, seven days a week.  Exhibit B (Affidavit of Robert Aldrich) ("Aldrich Affid.") at ¶ 4.  Before an inmate is approved to participate in EM, their "Home Plan" must be approved.  Aldrich Affid. ¶ 5.  The "Home Plan" details where the inmate is going to live, and with whom.  Id.  The approval process includes criminal background checks of everyone who lives in the inmate's proposed residence.  Id.  EM participants are not allowed to associate with known felons or their co-defendants.  Aldrich Affid. ¶ 6.

Participants are also required, in advance, to provide their Electronic Monitoring Field

4

Officer with a weekly schedule of their activities. Aldrich Affid. ¶ 8. Typically, EM participants work at jobs between the hours of 9:00 a.m. and 5:00 p.m., and are required to return home after work, and remain at home. Aldrich Affid. ¶ 9. Participants are required to remain at home on weekends, but are typically allotted two (2) hours per week to take care of personal matter, such as hair cuts. Id. Participants must inform their field officer of any deviations from their schedule, in advance, and unapproved deviations can lead to a return to higher custody, such as the Barnstable County Correctional Facility ("BCCF"). Aldrich Affid. ¶¶ 9-10.

      There is legitimate, governmental interest in the regulation requiring approval from BOP before an inmate has contact with the media. Significantly, nothing in the media regulation implicates any restrictions on the content of Petitioner's speech. The media notice provision is required to ensure safety and security, and to ensure that inmates do not violate conditions of their confinement by being in the presence of a person with a criminal record, a person possessing a deadly weapon, or of persons possessing narcotics or other controlled substances. The possibility of direct access to weapons, drugs, associates, and communication devices continuously pose a threat to the field officer that is conducting unannounced visits to the inmate. Aldrich Affid. ¶ 15. It is precisely for these reasons that program rules and instructions are established. Id. By compliance with EM rules, regulations and instructions, the field officer can effectively reintegrate an individual, while minimizing a community's exposure to the inmate and ensuring officer safety. Aldrich Affid. ¶16. The period of home confinement is a delicate phase of the reintegration process. Aldrich Affid. ¶23. It is a time when becoming a productive citizen hinges on the inmate's ability to build on the structure and discipline he has learned while being incarcerated. Id.

In addition to a policy that allows for access to the media with advance approval, Petitioner had alternative means of access to the media that did not require advance approval. Petitioner had the right to correspond with representatives of the media, without his letter being opened or read by institution officials. Ex. A at p. 5, Section F(2).

Accommodation of Petitioner's claimed right - unfettered access to the media - would not only jeopardize the safety of field officers and the community, and potentially affect Petitioner's successful reintegration, it would have a practical impact on officer safety, the community, and prison administration. Field officers are tasked with conducting unannounced visits to an inmate's home and work, and tracking an inmate's progress in the program. Aldrich Affid. ¶ 17. The times of the visits are varied. Id. Media encampment at the home or work of an inmate could eliminate the element of surprise, as well as disclose the location of the field officer, who may have other visits to perform that day. Aldrich Affid. ¶18. Other inmates may become aware of an imminent visit by this officer, putting officer safety at risk. Id. Furthermore, inmate access to the media could be used to incite or organize a disturbance, communicate or instruct inmate populations within facility walls, or pose threats to other law enforcement and government agencies, making advance notice of contact with the media important. Aldrich Affid. ¶19. From an administrative perspective, advance notice of media contact by an inmate allows the Sheriff's Office, the Bureau of Prisons, and other law enforcement agencies, to be prepared to react as necessary. Aldrich Affid. ¶22.

Access to an inmate on EM is vitally important. Aldrich Affid. ¶20. Media congestion, or the continuous presence of media, would hinder, slow, or limit a field officer's access to an inmate. Id.

Therefore, for these reasons, the BOP policy that provides for access to the media, with advance approval, an is not a violation of Petitioner's constitutional rights.

## II. Petitioner Was Afforded Due Process During His Disciplinary Proceedings

In Wolff v. McDonnell,[3] the Supreme Court "set forth the due process requirements associated with prison disciplinary hearings. Those requirements include written notice of the charges at least twenty-four hours in advance of the hearing, and the [qualified] ability to call witnesses and present documentary evidence." Suprenant v. Rivas, 424 F.3d 5, 16 (1st Cir. 2005) (citing Wolff, 418 U.S. 539 (1974). Those requirements were met in this case. See Exhibit C (Action by DHO and Checklist).

On August 19, 2009, Barnstable Deputy Patricia Sprague received an incident report [Doc. 1-4 at p. 3] for the unauthorized interviews with NBC Channel 10 and *Access Hollywood*. Exhibit D (Affidavit of Patricia Sprague) ("Sprague Affid.") at ¶ 5. At approximately 10:30 a.m. on that same date, Deputy Sprague delivered to Petitioner a request for evidence form, request for witness form, and a notice of hearing which was set for August 21, 2009. Id. Later in the day on August 19, 2009, Deputy Sprague received a second incident report [Doc. 1-4 at p. 1] regarding Petitioner's interview with the radio show. Id. That same day, at approximately 2:00 p.m., Deputy Sprague again served evidence and witness requests forms on Petitioner for the second incident report, along with a notice that both disciplinary hearings would take place concurrently on August 21, 2009. Id. Accordingly, Petitioner received written notice and, indeed, more than twenty-four hours notice of the hearing.

On August 20, 2009, Deputy Sprague received the witness and evidence forms for the

---

[3] Wolff concerned the revocation of good-time credits.

first incident report, but not the second. Sprague Affid. at ¶ 6. Petitioner stated that he needed further time to submit the witness and evidence forms for the second report, which was allowed. Id. After reviewing the forms that she received, Deputy Sprague decided to reschedule Petitioner's hearing for August 26, 2009, based on the number of witnesses and amount of evidence that were requested by Petitioner. Id. On August 20, 2009, at approximately 4:00 p.m., Petitioner was informed that the hearing was rescheduled. Id. At that time, Petitioner stated that he did not want to submit further requests for evidence or witnesses for the second report. Id.

On August 21, 2009, Deputy Sprague received a declaration from Petitioner's attorney, Cynthia Ribas, along with several e-mails, memos and internet articles, and two (2) letters from the ACLU. Sprague Affid. at ¶ 7. The documents were copied and provided to Petitioner that same day. Id.

On August 26, 2009, Deputy Sprague arranged for Petitioner to be brought out of his unit to obtain a statement from him in advance of his disciplinary hearing. Sprague Affid. at ¶ 8. Petitioner was read his rights, and he refused to sign the inmate rights form. Id. Petitioner elected not to give a statement to Deputy Sprague at that time. Id. On August 26, 2009, Deputy David conducted a hearing, with Petitioner present.

From September 1 through September 9, after the Disciplinary Hearing Officer determined that a rehearing was necessary to comply with BOP policy and Wolff standards, Deputy Sprague obtained further written statements, including statements from individuals involved with the interview approval process, a statement regarding Petitioner's knowledge of the restriction on his ability to speak to the media without prior approval, and the list of approved NBC staff members that would be present at the interview that was approved. Sprague

Affid. at ¶¶ 9-11. On September 11, 2009, Deputy Sprague contacted Deputy Cahoon, and instructed him to conduct a re-hearing. Sprague Affid. at ¶ 12. The statements that Deputy Sprague had obtained were provided to the Petitioner on September 11, 2009, and he was given time to review the statements and to take notes. Id.

Ultimately, the disciplinary process resulted in a sanction that included, inter alia, loss of 9 days good conduct time ("GCT") for Petitioner.[4] Due process in the prison discipline context requires only that "some evidence" support a disciplinary decision. Superintendent v. Hill, 472 U.S. 445, 455-56 (1985); see also Johnson v. Goord, 487 F.Supp.2d 377 (2d Cir. 2007). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." Id. "Under this standard, a DHO's determination has sufficient support if there is a 'modicum' of evidence, or 'any' evidence in the record to support it." Homen v. Hasty, 229 F.Supp.2d 290, 297 (S.D.N.Y. October 31, 2002)(citing Zavaro v. Coughlin, 970 F.2d 1148, 1148-49 (2d Cir. 1992)); Rudd v. Sargent, 866 F.2d 260, 262 (8th Cir. 1989)(statements in officer's disciplinary report constituted "some evidence" even though officer did not witness alleged violation); White v. Kane, 860 F.Supp. 1075, 1078 (E.D.Pa. 1994)(guards' written reports constitutes "some evidence").

In addition to the statements received by Deputy Sprague, as well as the incident reports in the record, Petitioner admitted to speaking with the radio station, as well as admitted to

---

[4] Petitioner may appeal that discipline, but it is expected that he will be released from confinement before the appeal process is concluded.

speaking to multiple news agencies. Thus, there is evidence in the record to support the disciplinary finding against him.

Petitioner was provided due process for the disciplinary hearing. He was provided with advance written notice of the charges, was afforded the opportunity for a staff representative, had the opportunity to request witnesses and to present documentary evidence, and to make a statement. Ex. C. Accordingly, Petitioner's due process rights were not violated in this case.

### III.  CONCLUSION

Wherefore, for the reasons set forth herein, and for those that have been argued orally and set forth in Respondent's initial response, the Respondents respectfully request that Petitioner's petition for writ of habeas corpus be dismissed.

Respectfully submitted,

MICHAEL K. LOUCKS
Acting United States Attorney

By:  /s/ Eve A. Piemonte Stacey
Eve A. Piemonte Stacey
Assistant U.S. Attorney
John J. Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210
Dated: September 16, 2009           (617) 748-3100

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on September 17, 2009.

/s/ Eve A. Piemonte Stacey
Eve A. Piemonte Stacey
Assistant United States Attorney