## United States District Court
## District of Massachusetts

```
_____
                              )
RICHARD HATCH,                )
          Petitioner,         )
                              )
        v.                    )    Civil Action No.
                              )    09-11490-NMG
HARLEY G. LAPPIN. and JAMES M.)
CUMMINGS,                     )
          Defendants.         )
_____)
```

### MEMORANDUM & ORDER

**GORTON, J.**

In this petition for a writ of habeas corpus, the petitioner has alleged violations of his First and Fifth Amendment rights.

## I.  Background

The petitioner, Richard Hatch ("Hatch"), is a prisoner currently being held by the United States Bureau of Prisons ("BOP") at the Barnstable County Correctional Facility ("BCCF") in Bourne, Massachusetts.[1]  In January, 2006, he was convicted in the United States District Court for the District of Rhode Island of two counts of attempting to commit tax evasion and one count of filing a false tax return.  The three offenses were related to the large money award Hatch received after he won the first season of the reality television show "Survivor."

---

[1] BCCF has a contract with the BOP to house certain federal prisoners.

-1-

Hatch was sentenced to a 51-month term of imprisonment to be followed by a 3-year term of supervised release. He was incarcerated at BOP facilities until May 12, 2009, at which time he was permitted to serve the remaining five months of his imprisonment in home confinement at his home in Rhode Island under the supervision of respondent James M. Cummings ("Cummings"), the Sheriff of Barnstable County. He was provided with a copy of 16 rules governing his home confinement set forth in the "Barnstable County Sheriff's Office Electronic Incarceration Program Federal Inmate Handbook" ("the Handbook").

As a person who has become accustomed to media attention, Hatch wished to speak with the media after he was convicted. While he was incarcerated at BCCF, his requests for permission to give media interviews were denied. After he was released to home confinement, his attorney at the time obtained permission from Carla Wilson ("Wilson"), the BOP's Public Media Executive, for Hatch to be interviewed by NBC at his home. Although Hatch's attorney reportedly believed such permission was unnecessary, she requested it "as a matter of courtesy." It appears that Wilson specifically allowed Hatch to be interviewed by NBC's Today Show and, at her request, NBC signed and faxed a BOP Media Representative Agreement to her.

On August 17, 2009, Hatch participated in a series of three interviews with three units of NBC: the Today Show, Access

Hollywood and NBC's local Rhode Island affiliate.  Although each
interview was conducted by a different interviewer, all were
conducted by NBC technical crews at the same location in Hatch's
house with the same equipment.  During the interviews, Hatch
apparently lamented that 1) he had been wrongly convicted, 2) he
was a victim of prosecutorial misconduct due, at least in part,
to his sexual orientation and 3) he had previously been
transferred to a prison far from his home and family perhaps due
to discrimination based upon his notoriety and sexual
orientation.

    Later that same day, Robert Corrente ("Corrente"), who
served as the United States Attorney for the District of Rhode
Island at the time of Hatch's prosecution, called into a local
radio station, WPRO News Talk ("WPRO"), and strongly denied the
allegations Hatch made on the Today Show.  Hatch also called into
the radio station to dispute Corrente's comments.

    The following day, Hatch was removed from home confinement
by BOP authorities and returned to BCCF to serve out the
remainder of his sentence.  Two disciplinary reports were filed
by Wilson citing Hatch with "Unauthorized Contact with the
Public" under "Prohibited Act Code(s) 327."  One report states
that the BOP approved only the Today Show interview but not the
other two interviews given by Hatch on August 17, 2009.  The
other report states that Hatch's "interview" with WPRO was also

unauthorized.

Hatch alleges that he was first shown those reports during a meeting with a Barnstable County officer on August 27, 2009.  He further claims that at that hearing he was not provided with copies of any reports or an opportunity to defend himself. Apparently, no further action was taken until a Barnstable County Disciplinary Hearing Officer determined that a rehearing was necessary and informed Hatch that one would be held on September 11, 2009 ("the Rehearing").  The Hearing Officer gathered further evidence with respect to the unauthorized interviews and provided Hatch an opportunity to review it.  As a result of the Rehearing, Hatch was sanctioned by the deprivation of nine days "good conduct time" previously earned, thus extending his term of imprisonment.

On September 9, 2009, just before the Rehearing, Hatch filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, along with a request for an expedited hearing (in light of the fact that his sentence will expire in a matter of weeks), challenging the constitutionality of his custody by the respondents, Cummings and Harley G. Lappin, Director of the BOP. He claims that his current incarceration violates his First Amendment right to free speech and his Fifth Amendment right to due process.

After holding a preliminary hearing on the matter and

reviewing supplemental memoranda submitted by both parties, the Court addresses Hatch's petition as follows.

## II.  **Legal Analysis**

### A.  **Legal Standard**

Pursuant to 28 U.S.C. § 2241, a federal district court may entertain a petition for a writ of habeas corpus filed by a prisoner who is held in federal custody within its jurisdiction. Such a petition may be used to challenge the execution of the prisoner's sentence.  See <u>Muniz</u> v. <u>Sabol</u>, 517 F.3d 29, 33-34 (1st Cir. 2008).

### B.  **Application**

#### 1.  **Use of the Writ of Habeas Corpus**

As a threshold matter, the respondents assert that a petition for writ of habeas corpus is an inappropriate means for obtaining the relief that Hatch seeks (i.e., release from imprisonment at BCCF and return to home confinement at his residence in Rhode Island).  In support of that assertion, they point out that the United States Supreme Court has held that, although habeas corpus is the appropriate remedy for challenging "the validity of the fact or length of [prisoners'] confinement," 42 U.S.C. § 1983 is more suitable for challenging the conditions of confinement.  See <u>Preiser</u> v. <u>Rodriguez</u>, 411 U.S. 475, 490, 499 (1973).

That answer is unavailing because the Court in <u>Preiser</u> was explicitly careful not to foreclose entirely the option of using habeas corpus to challenge prison conditions.  <u>Id.</u> at 499. Indeed, pursuant to <u>Preiser</u>, the First Circuit Court of Appeals permitted a prisoner to seek redress by evoking habeas corpus when his admission to a work release program at a halfway house had been revoked.  <u>See</u> <u>Brennan</u> v. <u>Cunningham</u>, 813 F.2d 1, 5 (1st Cir. 1987).  Similarly, this Court will permit Hatch to employ the writ as a vehicle to challenge the revocation of his home confinement.

Moreover, Hatch's petition is closely related to a challenge to the length of his incarceration, which the respondents concede would be properly brought by the filing of a petition for habeas corpus.  That is so because his alleged disciplinary violations have resulted in the forfeiture of certain good time credits, thereby extending his sentence by nine days.  <u>See</u> <u>id.</u> (finding that a habeas corpus petition challenging the revocation of admission to a halfway house was "closely related" to a challenge to the length of incarceration because the halfway house was a step along the road to parole).  Accordingly, Hatch may properly proceed with his petition for habeas corpus.

### 2.   Free Speech

Hatch argues that the punishment imposed upon him by the BOP for giving "unauthorized" media interviews violates his right to

-6-

free speech guaranteed under the First Amendment.  He adds (persuasively) that the First Amendment's protections extend even to comments, such as his, that criticize the United States Attorney's Office and the BOP.  See Hustler Magazine v. Falwell, 485 U.S. 46, 51 ("The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office...."); New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964) (recognizing "a profound national commitment to the principle that debate on public issues ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials").

An inmate's constitutional rights may be validly restricted only so long as the restriction is "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987).  Hatch seeks to differentiate the particulars of his case from Pell v. Procunier in which the Supreme Court upheld a prison's rule prohibiting media interviews with inmates in the prisons.  See 417 U.S. 817, 835 (1974).  According to Hatch, in that case, the Supreme Court identified two legitimate penological interests for such restrictions: 1) curbing the security risks that arise in a prison when outsiders are allowed to enter and 2) avoiding the disciplinary problems that arise when press attention focuses on a few inmates who thereby gain

-7-

notoriety and influence among the prison population (and can set an example of noncompliance with prison regulations that other inmates follow).  See id. at 827, 831-32.  Hatch argues that neither of those interests applies in this case because he was in home confinement and not among a general prison population when he gave the interviews.

A closer reading of the Pell opinion, however, renders it controlling in this case.  As an initial matter, although Hatch was not behind prison walls when released on home confinement, he remained in the custody of the BOP serving out his imposed sentence.  As explained in the Barnstable County Pre-Release and Day Reporting Center's Statement of Work (July, 2008), home confinement is intended "to provide extended confinement services for federal offenders."

As the respondents suggest, the first legitimate penological interest identified in Pell is applicable to the media restriction at issue in this case.  The BOP has an interest in enforcing a rule that prohibits inmates in home confinement from being in the presence of a person with a criminal record or someone possessing a deadly weapon and/or controlled substances. Compliance with that rule assists the BOP in rehabilitating the inmate's criminal proclivity and prevents the inmate from becoming a danger to the field officers who conduct random visits to ensure that the inmate is abiding by the conditions of his

confinement.  The BOP can enforce that rule only if it knows in advance the identity of persons with whom the inmate will come into contact.  It becomes so informed by requiring an inmate to submit a request for approval to conduct a media interview (a request which is accompanied by a list of people who will be involved in the interview).  Thus, the BOP's requirement that an inmate in home confinement must obtain approval for media interviews is reasonably related to the legitimate penological interest in ensuring safety at the inmate's place of confinement.

Moreover, the Supreme Court in <u>Pell</u> indicated that courts faced with First Amendment challenges such as Hatch's should consider the alternative means of communication with persons outside the prison that are available to inmates under a disputed regulation.  See <u>id.</u> at 823.  In that case, the Court concluded that, in light of the fact that inmates could communicate with the press by mail and through those who were permitted to visit them (family, counsel, clergy, etc.), a prison regulation prohibiting face-to-face communication between inmates and media representatives was a reasonable "time, place and manner" restriction.  <u>Id.</u> at 824-28.  The same alternative communication methods were available to Hatch.  Furthermore, he was permitted to communicate face-to-face with media representatives who had been cleared by the BOP.  Hatch's ability to communicate with the media as authorized supports this Court's determination that

-9-

Hatch's First Amendment rights have not been violated.

That determination is further supported by the fact that the BOP has a legitimate penological interest in placing inmates in home confinement.  Such a transitional setting between prison and outright release helps to reintroduce prisoners to the community at large and enables them to become productive members of society.  If the BOP lacked the authority to impose reasonable regulations upon inmates serving terms of home confinement, such as requiring them to obtain prior authorization before speaking with the media, it would be reluctant to exercise its discretion to place inmates in home confinement in the first place.  Indeed, to prohibit an inmate from conducting a media interview, the BOP could simply refuse to transfer him or her to home confinement. See Pell, 417 U.S. at 835.  So as not to discourage the BOP from placing inmates in home confinement, this Court will uphold its reasonable regulation with respect to media interviews.

Hatch also contends that the BOP has violated the First Amendment by limiting the size of his audience.  The Court finds that contention to be without merit because the BOP's prior authorization requirement for media interviews does not impose a ceiling on the number or size of interviews an inmate may conduct.  Although Hatch complains that a BOP representative expressed concern over a "media blitz" when he indicated a desire to give interviews, he offers no evidence that the BOP refused to

approve any interviews while he was in home confinement.

In addition, Hatch argues that limiting his contact with the media is such an overly-broad restriction that it violates the First Amendment.  In support of that argument, he cites cases from other circuits striking down regulations prohibiting association with members of any "disruptive group" and those barring use of a computer without permission as overly broad. See United States v. Soltero, 510 F.3d 858, 867 (9th Cir. 2007); United States v. Sales, 476 F.3d 732, 736 (9th Cir. 2007); United States v. Crume, 422 F.3d 728, 733 (8th Cir. 2005).  That argument is unpersuasive because the case law cited by Hatch is not binding on this Court and, furthermore, the "no media contact" restriction is significantly more specific than "no association with a disruptive group" or "no unauthorized computer use."

### 3.   Due Process

Hatch also contends that he is entitled to a writ of habeas corpus because the BOP violated his Fifth Amendment right to due process by 1) arbitrarily punishing him for contacting the media when no rule prohibited him from doing so and 2) failing to allow him to review the evidence against him or to present evidence in his own defense at the August 27, 2009, hearing.  The Court rejects both of his arguments.

Case 1:09-cv-11490-NMG   Document 13   Filed 09/23/09   Page 12 of 18

### a.   Arbitrary Punishment

In support of his argument that no rule prohibited him from contacting the media while he was in home confinement, Hatch first notes (correctly) that the Handbook with which he was provided contains no mention of media contact.  Next, Hatch points out that the two incident reports issued as a result of his "unauthorized" interviews do not specify the origin of "Prohibited Act 327."  He suggests that a "Prohibited Act" numbered 327 and entitled "Unauthorized contacts with the public" can be found in two places: BOP Policy Statement 5270.07 ("the Policy Statement") and 28 C.F.R. § 541.13.

Hatch contends that those sources did not apply to him when he was placed in home confinement.  The Policy Statement quotes 28 C.F.R. § 541.10(a) which describes, in part, the reach of § 541.13.[2]  See Fed. BOP, Change Notice, Directive Affected: 5270.07, at 24 (Jan. 9, 2003), available at http://www.bop.gov/policy/progstat/5270_007.pdf.  The Policy Statement goes on to announce that the provisions (including § 541.13)

> do not apply to a federal inmate designated to a non-federal facility (e.g., inmates serving Federal sentences in state facilities or contract CCCs [which includes home confinement]).

Id.

---

[2] 28 C.F.R. § 541.10(a) provides that "[t]he provisions of this rule apply to all persons committed to the care, custody, and control (direct or constructive) of the Bureau of Prisons."

-12-

The respondents counter by referring to 1) BOP Program
Statement 7300.09, § 2.3.3(b), which requires approval for any
"media request to interview an inmate at a contract facility" and
2) Barnstable County Sheriff's Office Procedure B(3)(h) which
provides that no inmate may be

> photographed, tape recorded, video recorded or filmed
> unless and until the Sheriff has received written
> approval from the authority having jurisdiction [in
> this case, the BOP].

According to the respondents, those regulations apply to Hatch
because the BCCF's Community Corrections Department Electronic
Monitoring Agreement, which Petitioner signed, establishes that

> the Electronic Monitoring Program is an extension of
> the confines of the Barnstable County Correctional
> Facility [and thus requires compliance] with all BCCF
> rules and regulations while on community release.

Hatch asserts that those rules are largely irrelevant
because they were not the basis of his disciplinary sanction
(i.e., he was adjudged guilty of violating "Prohibited Act 327,"
not Barnstable County Procedure B(3)(h) or BOP Program Statement
7300.09). At first glance, this argument seems plausible, but,
upon closer examination, it becomes clear that "No. 327" was
merely used as a label to describe the offending conduct
(unauthorized media contact). Barnstable County Sheriff's Office
Procedure B(3)(h), which similarly forbids unauthorized media
contact and is made applicable to Hatch through the Electronic
Monitoring Agreement, is the regulation that Hatch violated.

-13-

Under that regulation, there is no ambiguity with respect to whether Hatch was required to obtain prior authorization as he did for the Today Show interview.  Although Hatch contends that Procedure B(3)(h), on its face, is aimed primarily at the media rather than inmates, its application is not circumscribed. Therefore, his argument is unavailing.

Accordingly, the Court finds that Hatch was, in fact, prohibited from contacting the media without prior authorization and, therefore, was not arbitrarily punished for doing so.

### b.    Inadequacy of Procedural Safeguards

Finally, Hatch contends that he was denied due process in violation of the Fifth Amendment because the BOP punished him without allowing him to consider the evidence against him or defend himself against the charges.  The Constitution guarantees the process which Hatch claims to have deserved only when a person is deprived of life, liberty or property.  In this case, Hatch's interest in liberty was at stake.

Not every change in the conditions of confinement constitutes a deprivation of liberty under the Constitution, even if there is a substantially adverse impact on the prisoner.  See Meachum v. Fano, 427 U.S. 215, 224-25 (1976) (finding no deprivation of liberty when a prisoner was transferred from a low- to maximum-security prison because confinement in any of the state's institutions was "within the normal limits or range of

-14-

custody which the conviction [had] authorized the State to impose"). Indeed, a constitutionally protected liberty interest arises only if a restraint on a prisoner's freedom imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484-86 (1995) (holding that placing a prisoner in segregated confinement did not deprive him of a liberty interest because it was within the "range of confinement to be normally expected" from the actual sentence imposed).

Hatch's regression from home confinement to imprisonment at BCCF does not constitute such an "atypical and significant hardship." His sentence provided for 51 months of imprisonment, all of which he could have been required to serve at BCCF. As stated in the Barnstable County Statement of Work, inmate participation in a home confinement program is a "privilege, not a right," awarded entirely at the discretion of the BOP. Thus, Hatch's re-imprisonment at BCCF following his unauthorized contact with the media while in home confinement was squarely within the limits of the sentence imposed upon him and, as such, did not deprive him of liberty triggering the procedural protections of the Due Process Clause. See Matlack v. Wiley, No. 07-cv-01169, 2007 U.S. Dist. LEXIS 86381, at *4-5 (D. Colo. Nov. 16, 2007) (finding no due process violation when a prisoner was returned to prison from a halfway house).

Although a closer call, Hatch's loss of nine days of good conduct time similarly does not rise to the level of a deprivation of liberty. An extension of incarceration for just over one week, when viewed against a sentence originally set at 51 months and resulting in a total sentence of less than that term, is not a "significant hardship."

Moreover, even if Hatch had a constitutionally protected liberty interest in the nine days of good conduct time, he received adequate due process from the disciplinary proceeding which ultimately deprived him of that time. The Constitution does not mandate that disciplinary proceedings for prison inmates provide the full range of procedures required at criminal proceedings. Wolff v. McDonnell, 418 U.S. 539, 558-63 (1974). In the prison setting, there must be mutual accommodation between the institutional needs and the applicable Constitutional provisions. Id. at 554. At a minimum, however, an inmate must be afforded: 1) written notice of the charges against him at least 24 hours in advance of the hearing, 2) a written statement by the fact-finder with respect to the evidence relied upon and the reasons for the disciplinary action and 3) the opportunity to call witnesses and present documentary evidence (so long as it will not be unduly hazardous to institutional safety or correctional goals). Id. at 563-66.

Even if, as Hatch contends, the August 27, 2009, hearing

-16-

lacked those required procedural safeguards, the respondents
corrected any potential due process violation by affording Hatch
the September 11, 2009, rehearing at which his good time credit
was formally revoked.  An affidavit and "Center Discipline
Committee Report" submitted by the respondents, and uncontested
by Hatch, indicate that Hatch was given advance notice of the
hearing and the opportunity to review the evidence offered
against him, including: 1) statements from individuals involved
in the media interview approval process, 2) a statement regarding
Hatch's knowledge of the restriction on his ability to speak with
the media without prior approval and 3) a list of the NBC staff
members who would be present at the approved interview.  He was
apparently also permitted to present documents and witnesses and
to make a statement in his own defense.

    The Supreme Court has held that the requirements of due
process are satisfied if there is some evidence in the record
that could support the decision of a prison disciplinary board to
revoke good conduct time.  Superintendent, Mass. Correctional
Institution v. Hill, 472 U.S. 445, 455 (1985).

> Ascertaining whether this standard is satisfied does
> not require examination of the entire record,
> independent assessment of the credibility of witnesses,
> or weighing of the evidence.

Id. at 456.  By application of this standard, there is ample
evidence in the record to support a disciplinary finding against
Hatch.  The prison disciplinary board relied on the incident

reports, statements from a Barnstable County officer and Hatch's own admissions.  Accordingly, any potential deprivation of liberty with respect to Hatch's good conduct time was accompanied by the level of process required under the Constitution.  See Wolff, 418 at 563-66; Superintendent, 472 U.S. at 455.

**ORDER**

In accordance with the foregoing, Richard Hatch's petition for a writ of habeas corpus (Docket No. 1) is **DISMISSED**.

**So ordered.**

                                   /s/ Nathaniel M. Gorton
                                   Nathaniel M. Gorton
                                   United States District Judge
Dated September 23, 2009